**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

In re:

HALI MAEANN SUAZO,

Debtor.

Bankruptcy Case No. 20-17836 TBM
Chapter 7

---

**AMENDED MEMORANDUM OPINION AND**
**ORDER ON MOTION TO EXAMINE FEE AGREEMENTS**

---

### I.    Introduction.

Attorneys who represent Chapter 7 debtors in bankruptcy generally require payment of their fees up front.  Up-front payment is sought because, under the Bankruptcy Code,[1] a debtor's pre-petition promise to pay attorney fees after the bankruptcy filing may be discharged as part of the bankruptcy process.  The system creates a conundrum because many debtors have difficulty paying attorney fees in advance.

In recent years, some attorneys have begun using so-called "bifurcated" fee agreements as a means of enabling debtors to pay most of the fees *after* they file for bankruptcy.  Under the bifurcated fee agreement model, a debtor is asked to sign a pre-petition contract wherein an attorney agrees to provide only very limited legal services through the petition date.  The attorney typically charges nothing or a small fee for performing the unbundled legal services, which consist of filing a "bare-bones" or "skeletal" case missing most of the documents required for a bankruptcy case to proceed to discharge.  Then, the idea is that after the petition date, the debtor will be offered a new post-petition contract in which the debtor agrees to pay for the remaining deferred legal services (usually at a rate materially in excess of the standard up-front fee and payable in installments).  The debtor is informed that if the debtor declines to sign a second fee agreement post-petition, counsel may withdraw, in which case the debtor will then need to proceed *pro se* or engage another lawyer.  There are some possible benefits as well as drawbacks to such a bifurcated fee agreement scheme.

This matter came before the Court on the "United States Trustee's Motion to Examine the Reasonableness of Fees Charged by Debtor's Counsel Under 11 U.S.C. § 329 and Review of Attorney Conduct Under 11 U.S.C. §§ 526 and 105" (Docket No.

---

[1]    All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

33, the "Motion to Examine") filed by Patrick S. Layng, United States Trustee for Region 19 (the "UST") and the Response and Objection thereto (Docket No. 40, the "Objection") filed by Ovation Law LLC ("Ovation") and Jonathan P. Shultz ("Mr. Shultz") who is a partner with Ovation.  Through the Motion to Examine, the UST attacked the propriety of the bifurcated Pre-Petition Agreement and Post-Petition Agreement used by Ovation and Mr. Shultz under a variety of legal theories.  The Court ultimately concludes that the Pre-Petition Agreement and Post-Petition Agreement utilized in this bankruptcy case both contain misrepresentations and are misleading since, among other things, they did not accurately disclose counsel's obligations under the Bankruptcy Code and Local Rules.  Thus, the Pre-Petition Agreement and the Post-Petition Agreement are void under Section 526.

## II.      Jurisdiction and Venue.

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(a) and (b).  This controversy is a core proceeding under 28 U.S.C. § 157(b)(2)(A) since it concerns administration of the bankruptcy estate.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The UST, Mr. Shultz, and Ovation all concur that the Court has jurisdiction to enter final judgment regarding this dispute.[2]  All the parties also agree that venue is proper in the Court.[3]

## III.      Procedural Background.

The Debtor, Hali Maeann Suazo ("Ms. Suazo"), filed a "Petition" (the "Petition") for bankruptcy protection under Chapter 7 on December 9, 2020 (the "Petition Date"), through her legal counsel:  Mr. Shultz.[4]  Ms. Suazo and Mr. Shultz both signed the Petition.[5]  Mr. Shultz executed the Petition, noting his relationship with an Arizona-based law firm:  Ovation.[6]

Contemporaneously with the commencement of the bankruptcy case, Mr. Shultz submitted a "Disclosure of Compensation of Attorney for Debtor" (the "Initial Compensation Disclosure"), wherein he disclosed that Ms. Suazo had not paid anything before the Petition Date but agreed to pay him (not Ovation) $2,998.00 later.[7]  The United States Trustee appointed Simon E. Rodriguez as the Chapter 7 Trustee (the "Chapter 7 Trustee") for Ms. Suazo's bankruptcy estate.[8]

The initial bankruptcy filing was a "bare-bones" or "skeletal" submission which did not include many documents required by Section 521.  Accordingly, on December 10, 2020, the Court issued a "Notice of Deficiency" requiring Ms. Suazo

---

[2]      Stip. Fact Nos. 12-13 and 15.
[3]      Stip. Fact No. 14.
[4]      Docket No. 1; Ex. 1; Stip. Fact No. 16.
[5]      Docket No. 1; Ex. 1; Stip. Fact No. 17.
[6]      Docket No. 1; Ex. 1.
[7]      Docket No. 8; Ex. 2; Stip. Fact No. 21.
[8]      Docket No. 7; Stip. Fact No. 19.

to file various documents by December 23, 2020.[9]  Thereafter, Mr. Shultz drafted the missing "Statement of Financial Affairs," "Summary of Assets and Liabilities," "Schedules," "Chapter 7 Statement of Current Monthly Income," and "Chapter 7 Means Test Exemption."  Ms. Suazo signed the foregoing documents on December 13, 2020.[10]  A few days later, on December 15, 2020, Mr. Shultz filed all such documents with the Court.[11]

Over the next few months, Ms. Suazo made a few minor changes.  On her behalf, Mr. Shultz filed an "Amended Statement of Intention for Individuals Filing Under Chapter 7," "Amended Schedule D," and "Amended Schedule E/F," a "Notice of Amendment," and a "Financial Management Course Certificate."[12]  Ms. Suazo received her Chapter 7 "Discharge Order" on March 15, 2021.[13]  The entry of a discharge effectively ended Mr. Shultz' work for Ms. Suazo.

Several months later, on April 22, 2021, the Trustee filed the Motion to Examine.[14]  The Motion to Examine seemingly prompted Mr. Shultz to submit an "Amended Disclosure of Compensation of Attorney for Debtor."[15]  Mr. Shultz and Ovation also filed their Objection to the Motion to Examine.[16]  The Court conducted a preliminary hearing on the Motion to Examine and Objection, during which the UST, Mr. Shultz, and Ovation requested a full evidentiary hearing.  The Court concurred and set a trial, along with various associated deadlines.[17]  Prior to the evidentiary hearing, the UST, Mr. Shultz, and Ovation submitted a "Joint Statement Regarding Stipulations of Fact and Exhibits" pursuant to which the parties agreed to certain stipulated facts and the admissibility of certain documents.[18]

On December 8, 2021, the Court conducted a trial on the Motion to Examine and Objection.  At the trial, the Court heard testimony from two witnesses:  the Chapter 7 Trustee and Mr. Shultz.  The Court admitted Exhibits 1-23 and 25 proffered by the UST.  The Court also admitted Exhibit A as a demonstrative exhibit proffered by Mr. Shultz and Ovation.  At the conclusion of the evidentiary presentation, counsel for the UST, Mr. Shultz, and Ovation presented comprehensive closing arguments based on the evidence.  The UST later submitted a post-trial legal brief (Docket No. 70) and Mr. Shultz and Ovation filed a supplemental citation to authority (Docket No. 71) alerting the Court to new case law which addresses issues similar to those presented in this case.

---

[9]   Docket No. 9; Stip. Fact No. 22.
[10]   Docket Nos. 12-22; Ex. 3; Stip. Fact Nos. 23-27.
[11]   *Id*.
[12]   Docket Nos. 23-26 and 29; Ex. 4; Stip. Fact Nos. 28-31.
[13]   Docket No. 30.
[14]   Docket No. 33.
[15]   Docket No. 41; Ex. 5; Stip. Fact No. 33.
[16]   Docket No. 40.
[17]   Docket No. 45.
[18]   Docket No. 59.  The Court sometimes refers to the foregoing as the "Stipulated Facts" or by abbreviation as "Stip. Fact No. ___."

Thereafter, the Court took the dispute under advisement.  In the interim, the Court has considered the testimony, evaluated all the exhibits admitted into evidence, and reviewed the applicable law.  The disputed issues are now ripe for consideration.  The Court wishes to acknowledge the especially professional and capable trial conduct and arguments of counsel for the UST, Mr. Shultz, and Ovation.

## IV.    Findings of Fact.

The Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9014(c), based upon the admissible evidence presented at the trial (including both testimony and exhibits) and the Stipulated Facts:

## A.    Mr. Shultz and Ovation.

Mr. Shultz is an attorney who has been licensed to practice law in the State of Colorado since 2008.[19]  Over the last 14 years, he has centered his practice exclusively in the area of consumer bankruptcy:  both Chapter 7 liquidations and Chapter 13 reorganizations.  During his career, Mr. Shultz has been counsel of record in approximately 469 individual consumer bankruptcy cases.  Mr. Shultz represents clients through two separate law firms:  (1) his own firm, the Law Offices of Jonathan P. Shultz LLC (the "Shultz Law Firm")[20]; and (2) and Ovation.[21]  Ovation is a law firm (structured as a limited liability company) based in Phoenix, Arizona.[22]

Mr. Shultz entered into a "Partnership Agreement" (the "Partnership Agreement") with Ovation just a month and a half before the Petition Date, whereby he became a new "Partner."[23]  In broad strokes, the Partnership Agreement states that Ovation will "originate[ ]" consumer bankruptcy clients and refer Ovation's Colorado clients to Mr. Shultz.  After a referral, Mr. Shultz will provide legal services to Ovation's clients.[24]  Then, in return for servicing Ovation's bankruptcy clients, Mr. Shultz will receive compensation from Ovation in an amount referred to as the "Partner Share."  In Chapter 7 bankruptcy cases, the "Partner Share" is "33 1/3% of the Agreed Fee" (which term means the "legal fees (exclusive of out-of-pocket costs

---

[19]     Stip. Fact No. 54.
[20]     Stip. Fact No. 51.
[21]     Stip. Fact No. 52.  Mr. Shultz testified that his work with Ovation "is not really going forward" since Ovation is not actively marketing in Colorado.
[22]     Stip. Fact No. 44.
[23]     Ex. 12; Stip. Fact No. 49.  The Partnership Agreement admitted into evidence is not executed by Ovation.  Accordingly, it may not be effective because, by its own terms, "the effective date" is "the day fully executed by both Parties [Ovation and Mr. Shultz]."  However, since neither Mr. Shultz, Ovation, nor the UST pointed to this anomaly, the Court will assume (as the parties apparently have) that the Partnership Agreement is effective.
[24]     Ex. 12 at 1-4. The Partnership Agreement provides that Mr. Shultz:  ". . . shall be a non-equity, non-voting member of [Ovation].  Firm will provide various marketing, administrative, and financial services, and [Mr. Shultz] will provide legal services . . . ."

such as filing fees, credit report fees, or fees for third-party financing in bifurcated chapter 7 cases) paid or agreed to be paid by clients of [Ovation]").[25]  The Partner Share is payable to Mr. Shultz only to the extent paid by Ovation's client and only after Ovation is reimbursed for all out-of-pocket costs and receives its 66 2/3% share of the Agreed Fee.[26]  Although Mr. Shultz is characterized as a "Partner" of Ovation, he is not a member of Ovation, has no equity in Ovation, and has no right to participate in management of Ovation.[27]  Both Mr. Shultz and Ovation agreed to Mr. Shultz's being able to maintain "a legal practice separate from [Ovation]."[28]  As part of the Partnership Agreement, Mr. Shultz committed to comply with certain "Firm Policies,"[29] sometimes also referred to as "Firm Policies and Procedures."  Mr. Shultz filed about 20 bankruptcy cases for Ovation clients in the year after he became affiliated with Ovation.

**B.**   **Fresh Start Funding.**

Fresh Start Funding, LLC ("FSF") is a company that provides financing and payment management services to law firms with consumer-focused practices, including law firms providing services to consumer bankruptcy debtors.[30]  Ovation has a business relationship with FSF.  In fact, some of the owners of Ovation "are also owners of FSF."[31]

In October of 2020, Ovation and FSF entered into a "Line of Credit and Accounts Receivable Management Agreement" (the "LOCARMA").[32]  Under the terms of the LOCARMA, FSF provides a $50,000 line of credit to Ovation in exchange for a lien on, and right to collect (on Ovation's behalf), Ovation's accounts receivable.  If an Ovation client's attorney fees are not completely paid prior to filing bankruptcy and Ovation wishes to obtain an advance under the line of credit, then:

a.   Ovation engages a client using a bifurcated fee agreement which allows for collection of attorney fees after the filing of the bankruptcy petition.

b.   Ovation uploads the client contract providing for the client's post-petition payment of attorney fees to FSF's online database.

c.   FSF reviews the client contract for compliance with its requirements and, if the client contract meets

---

[25]   *Id*. at 3; Stip. Fact No. 55.
[26]   Ex. 12 at 3.
[27]   *Id*. at 1-3; Stip. Fact No. 50.
[28]   Ex. 12 at 4-5.
[29]   *Id*. at 5; Ex. 13.
[30]   Stip. Fact No. 62.
[31]   Ex. 6 at 6.
[32]   Ex. 10; Stip. Fact No. 64.

these requirements, it becomes an "Approved Account."

d.    After the client contract becomes an Approved Account, Ovation is entitled to a 75% advance on the receivable and FSF must, within three business days, advance to Ovation 65[%] of the entire fee charged to the client, described as the "Initial Amount."

e.    The remaining 10 percent, (the "Holdback Amount") is retained by FSF "as security for the performance of all Approved Accounts funded by FSF" under the terms of the LOCARMA.

f.    Ovation's fee for its services is calculated as 25% of the total amount of the Approved Account.[33]

Ovation is liable to FSF for the entire amount of each Approved Account, including FSF's 25% fee, regardless of whether the debtor associated with the Approved Account pays anything.[34] The LOCARMA provides that FSF will aggregate the Holdback Amount from each of Ovation's clients into a single account (the "Holdback Account").[35] This Holdback Account is additional collateral security "for the performance of all Approved Accounts funded by FSF" under the LOCARMA.[36] When and if a debtor associated with an Approved Account is delinquent in making a scheduled payment, FSF debits Ovation's Holdback Account for the amount of the delinquent payment.[37] If FSF is later able to collect the delinquent payment, the amount collected is credited back to Ovation's Holdback Account.[38] Likewise, if a debtor defaults on an obligation to Ovation, the unpaid balance of the Approved Account is debited against Ovation's Holdback Account.[39]

The LOCARMA provides that Ovation will disclose the existence of the LOCARMA to its clients, answer any questions about the agreement, and attain, in writing, the client's consent to the assignment of their account as an Approved Account.[40] Under the LOCARMA, FSF "shall manage and collect payments directly from Clients associated with Approved Accounts as the Firm's [Ovation's] agent, and apply such payments to the Line of Credit . . . ."[41]

---

[33] Stip. Fact No. 64.
[34] Stip. Fact No. 65.
[35] Stip. Fact No. 66.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] Stip. Fact No. 67.
[41] Ex. 10 at 1; Stip. Fact No. 69.

C.   **Ms. Suazo's Initial Engagement of Ovation through the Pre-Filing Agreement**.

During late 2020, Ms. Suazo was considering her financial condition and possible bankruptcy.  Toward that end, Ms. Suazo conducted a "Google" search on the internet and located Ovation.[42]  Ovation appealed to Ms. Suazo because Ovation offered payment plans and "no money up front" for bankruptcy services.[43]  Ms. Suazo contacted Ovation and entered various information into Ovation's internet website portal.[44]  She did not consult any other law firms.[45]

Thereafter, a representative of Ovation (not Mr. Shultz) communicated with Ms. Suazo concerning her financial situation.[46]  During the trial, the Court received no evidence concerning the particulars of the initial discussion.  However, on November 30, 2020 (at 12:48 p.m.), Patrick Duffin (an employee of Ovation) sent Ms. Suazo a "Pre-Filing Agreement" (the "Pre-Filing Agreement") to engage Ovation to file a Chapter 7 bankruptcy case on her behalf.[47]  Less than 17 minutes after receiving the Pre-Filing Agreement (at 1:05 p.m.), Ms. Suazo signed and returned the Pre-Filing Agreement to Ovation through DocuSign.[48]  Given the length of the Pre-Filing Agreement (17 pages), it would have been virtually impossible for Ms. Suazo to have read and considered the entire text of the Pre-Filing Agreement before she signed and returned it.  The Court received no evidence that any representative of Ovation ever explained retention and billing options to Ms. Suazo.  Ms. Suazo did not consult with her eventual Ovation attorney (Mr. Shultz) before signing the Pre-Filing Agreement.  In any event, the next day (December 1, 2020), Patrick Duffin signed the Pre-Filing Agreement for Ovation.[49]  Then, Mr. Duffin apparently forwarded the Pre-Filing Agreement to Mr. Shultz.  Mr. Shultz (who had not yet communicated with Ms. Suazo) signed the Pre-Filing Agreement shortly thereafter.[50]

A few days later (on December 4, 2020) — after Ms. Suazo already executed the Pre-Filing Agreement — Patrick Duffin (at Ovation) sent Ms. Suazo's contact details and a summary of information provided by Ms. Suazo to Mr. Shultz (who, before consulting with Ms. Suazo, had already signed the Pre-Filing Agreement).[51]  The same day, Mr. Shultz sent Ms. Suazo a text message concerning her possible bankruptcy.[52]  But, at that stage, under the Pre-Filing Agreement, Ms. Suazo already had committed to hire Ovation to represent Ms. Suazo "in a Chapter 7 bankruptcy."  In other words, Ms. Suazo's lawyer (Mr. Shultz) did not confer with

---

[42]   Stip. Fact No. 42.
[43]   Stip. Fact No. 43.
[44]   Stip. Fact No. 45.
[45]   Stip. Fact Nos. 40 and 41.
[46]   Stip. Fact No. 46.
[47]   Ex. 6 at 10, 11, 17, and 18.
[48]   *Id.*; Stip. Fact No. 57.
[49]   Ex. 6 at 10, 11, 17, and 18.
[50]   *Id.*
[51]   Stip. Fact No. 47.
[52]   Stip. Fact No. 48.

Ms. Suazo about the advisability of her filing for bankruptcy protection, the various bankruptcy options available (such as Chapter 7 liquidation or Chapter 13 reorganization), or the legal services engagement and payment alternatives before Ms. Suazo committed herself through the Pre-Filing Agreement to a bifurcated Chapter 7 bankruptcy case for "no money up front."

The terms of the Pre-Filing Agreement are important to this controversy and serve as the basis for the bifurcated fee structure.  Section 1 of the Pre-Filing Agreement groups "The Work Involved in a Chapter 7 Case" into three categories: "Pre-Filing Services," "Post-Filing Services," and "Supplemental Post-Filing Services."  It also lists certain "Excluded Services."[53]  In the Pre-Filing Agreement, Ms. Suazo elected to use a bifurcated fee arrangement described in the agreement as "File Now Pay Later."

The Pre-Filing Agreement purports to create a separation between "Pre-Filing Services" and "Post-Filing Services."  The Pre-Filing Agreement identifies "Pre-Filing Services" as:  meeting and consulting with the debtor as needed prior to the case; analyzing the information from the intake questionnaire and other documents; providing due diligence, legal analysis and legal advice; and preparing and filing the petition, statement about social security numbers, and a list of creditors, and filing pre-petition counseling certificates.[54]

The Pre-Filing Agreement assumes that counsel will not file all the required bankruptcy documentation at the beginning of the insolvency case but instead will wait until after the Petition Date.  The Pre-Filing Agreement describes the "Post-Filing Services" as:  preparing and filing the debtor's statement of financial affairs and schedules; preparing and filing the means test calculations and disclosures; conducting a second signing appointment to review and sign the statements and schedules; preparing for and attending the Section 341 meeting of creditors; administrating and monitoring the case and communicating with the debtor throughout the process; forwarding the Trustee questionnaire and debtor documents to the Trustee; noticing the debtor's employer to stop any garnishments; reviewing and responding to Trustee requests; reviewing and advising the debtor regarding any motions for stay relief; reviewing and advising the debtor regarding any reaffirmation agreements or redemptions; reviewing and advising the debtor regarding any creditor violations; and any legal service required by the local rules.[55] The foregoing are all of the main tasks required to prosecute a non-complex Chapter 7 insolvency proceeding.

Section 2 of the Pre-Filing Agreement is entitled:  "Your Options to Pay Our Attorney Fee and Costs."  The paragraph immediately under that heading states:

> The Law Firm offers two options for you to pay the
> attorney fees and costs for your chapter 7 bankruptcy.

---

[53]   Ex. 6 at 1-2; Stip. Fact No. 82.
[54]   Ex. 6 at 1; Stip. Fact No. 83.
[55]   Ex. 6 at 1; Stip. Fact No. 84.

You can either "***Pay Before You File***" or "***File Now Pay Later***."  The costs and other terms of each Option are discussed below, and you must choose one of these two Options that is best for you by writing your initials in the box next to your selection.  We will be pleased to represent you under either of these options.[56]

(Emphasis in original.)  The Pre-Filing Agreement identifies each option as follows:

☐ **Option #1 – *Pay Before You File***

Under this *Pay Before You File* option, you will only sign this one agreement, and the Law Firm will provide both the Pre-Filing Services and the Post-Filing Services listed above. Our attorney fee for filing and handling your chapter 7 bankruptcy will be $2,343.00 which includes the $335 court filing fee, credit report fee ($38 if single and $76 if married), $18.99 Credit Counseling Class and $12.99 Debtor Education Class.

**This *Pay Before You File* option is less expensive to you, but:**

(1) *you are required to pay the full amount of attorney fees and costs before your case is filed,*

(2) if you require any of the Supplemental Post-Filing Services described above *you will be required to pay additional legal fees* based on our hourly rates of **$350/hour** for attorney time and **$150/hour** for paralegal time, and

(3) the Law Firm may provide some of the Post-Filing Services before the case is filed.

☒ **Option #2 – *File Now Pay Later***

***This File Now Pay Later option is more expensive to you, but will include more legal services and allow you to pay some of the costs and our attorney fee in installments over twelve (12) months after we file your case.*** Under the *File Now Pay Later* option, we will split our work for you into two separate agreements in order to offer you the ability to pay after your case is filed. You may review the second agreement before you sign this agreement.

Under this Pre-Filing Agreement, we will <u>only provide the Pre-Filing Services listed above.</u> Our fee for the Pre-Filing Services will be <u>$0.00</u> and we will pay the cost of the credit reports and the 1st required class. We will waive those costs and our fees for the Pre-Filing Services so you will never have to pay for them. ***The Pre-Filing Services are not all of the tasks that must be completed to successfully complete your chapter 7 case.***

After your case is filed, you will have three choices to complete your case:

- You can represent yourself in your bankruptcy case (called "proceeding *pro se*");
- You can hire another attorney to represent you in your bankruptcy case; or,
- *Within ten (10) days after your case is filed,* you can enter into a **Post-Filing Agreement** with us.

If you choose to represent yourself or to hire another attorney to represent you (either of which are completely up to you) you will not owe us anything additional. We will ask the bankruptcy court to allow us to withdraw as your lawyer in accordance with the bankruptcy rules, but we will continue to represent you in the case and perform all necessary services until and unless the bankruptcy court allows us to withdraw.

If you choose to enter into a **Post-Filing Agreement** with us, we will provide you with the Post-Filing Services AND the Supplemental Post-Filing Services listed above, and our fee for these services will be $2,998.  You will be able to pay this fee over a period of twelve (12) months after we file your case. This fee includes the $335 filing fee and the cost of the Financial Management class, and we will not charge you additional fees for the Supplemental Post-Filing Services if they are needed in your case.

---

[56]     Ex. 10 at 2; Stip. Fact No. 86.

Ms. Suazo checked the File Now Pay Later option.  Thereafter, the Pre-Filing Agreement lists four potential "File Now Pay Later Payment Options."  Ms. Suazo elected:  "26 equal bi-weekly payments of $115.31."[57]

Section 3 of the Pre-Filing Agreement, entitled "Information about the Lender the Law Firm Uses So It Can Offer the File Now Pay Later Option," provides general information about FSF, including a rationale for why Ovation charges a higher fee for the File Now Pay Later option.[58]  Section 3(E) of the Pre-Filing Agreement states:

> The statements and schedules that are filed with the court on your behalf may show that your expenses exceed your income. You nonetheless believe that the File Now Pay Later option is the best choice for you and you believe that you can make the required payment to FSF.[59]

Section 4 of the Pre-Filing Agreement is titled "Important Information about Conflicts of Interest" and provides:

> A conflict of interest is a situation where the Law Firm's interest and your interest are, or could be, in conflict. There are a number of actual or potential conflicts of interest that we need to disclose to you.
>
> A.      Pursuant to the Rules of Professional Conduct, the Law Firm cannot act as your counsel to help you decide whether to enter into this agreement. Nonetheless, we can explain this agreement to you and by signing this agreement you agree that we fully explained the terms of this agreement to you and answered any questions you had regarding the matters described in this agreement.
>
> B.      There is an inherent conflict whenever attorneys represent debtors in bankruptcy for a fee.  We are working to alleviate your financial issues, while at the same time charging a fee for our services.  By signing this agreement, you acknowledge that you understand this explanation and give your informed consent to waive this conflict.
>
> C.      The Law Firm is filing your case hoping that you will sign a Post-Filing Agreement, and this may create

---

[57]      Ex. 6 at 4.
[58]      Ex. 6 at 4-5; Stip. Fact No. 91.
[59]      Ex. 6 at 5; Stip. Fact No. 92.  This paragraph does not fit into the category as titled, as it is not information about FSF, but instead purports to bind the Debtor to making such representation.

a conflict of interest between you and the Law Firm since executing the Post-Filing Agreement will obligate you to make post-filing payments that will not be discharged in your bankruptcy.  By signing this agreement, you acknowledge that you understand this explanation and give your informed consent to waive this conflict.

D.     As described above, if you choose the *File Now Pay Later* option and enter into a Post-Filing Agreement, the Law Firm will borrow funds from FSF based on the amount you owe the Law Firm. This may place the Law Firm in conflict with you since the Law Firm expects to receive payments from you in order to repay FSF, and the Law Firm wishes to maintain its business relationship with FSF.  By signing this agreement, you acknowledge that you understand this explanation and give you informed consent to waive this potential conflict.  In addition, some owners of the Firm are also owners of FSF and will receive financial benefits from the loan made by FSF to the Firm . . . .

. . . .

F.     If you choose the *File Now Pay Later* option but choose not to sign a Post-Filing Agreement, the Law Firm may file a motion to withdraw from your case, which may create a conflict of interest if you do not want the Law Firm to withdraw.  By signing this agreement, you acknowledge that you understand this explanation and give your informed consent to waive this potential conflict.[60]

Section 6(A) of the Pre-Filing Agreement speaks to "Unbundling or Limited-Scope Representation" and states:

By signing below, you acknowledge that the Law Firm has expressed that it is ready, willing and able to represent you for your entire chapter 7 case, even if you choose the *File Now Pay Later* option, which will require you to sign a Post-Filing Agreement.  If you choose the *File Now Pay Later* option, you further represent that you are not doing this with the intention of having the Law Firm simply file your case and then withdraw, but instead to facilitate you

---

[60]     Ex. 6 at 5-6; Stip. Fact No. 93.

> making payments over time for your attorney fee so that
> you can have an attorney represent you through the
> entire chapter 7 process.[61]

As set forth above, Ms. Suazo did not elect Option #1, the "Pay Before You File" option identified in the Pre-Filing Agreement.  Under that option, she would have had to pay $2,343.00 in attorney's fees and costs (including the $335.00[62] filing fee) up front.  Instead, Ms. Suazo elected Option #2, the "File Now Pay Later" option, under which she committed to pay nothing for Pre-Filing Services unless she entered into a Post-Filing Agreement in which she would be required to pay $2,998.00 in attorney's fees and costs (including the $335.00 filing fee) payable over one year in 26 equal bi-weekly installments.

**D.     Bankruptcy Services Performed by Ovation and Mr. Shultz Prior to the Petition Date.**

As previously explained, Ms. Suazo and Mr. Shultz executed the Pre-Filing Agreement and agreed to the entire fee structure for Ms. Suazo's Chapter 7 bankruptcy case before they had ever even conferred with each other.  The Court received no evidence that Ovation ever "fully explained" the terms of the Pre-Filing Agreement to Ms. Suazo.  But, a few days later, on December 4, 2020, Mr. Shultz made initial contact with Ms. Suazo.  Although Mr. Shultz did not recall all the details of his call with Ms. Suazo, his typical pattern and practice includes discussing standard bankruptcy topics such as: the urgency of seeking bankruptcy relief; tax refunds; student loans; and Colorado exemptions.  Mr. Shultz testified that he likely followed such standard practices with Ms. Suazo and is "100% sure" he had a conversation with Ms. Suazo during which he explained that her student loans were nondischargeable in bankruptcy.

In any event, during the following days, Mr. Shultz prepared a few bankruptcy documents for the "bare-bones" submission including:  the Petition; the Initial Compensation Disclosure; a Statement of Social Security Number; and Statement of Intention for Individuals Filing Under Chapter 7.  Mr. Shultz must have sent the drafts to Ms. Suazo because, on December 9, 2020, Ms. Suazo signed all of the foregoing documents under penalty of perjury.[63]  Mr. Shultz also executed both the Petition and the Initial Compensation Disclosure.  Then, on the same day (December 9, 2020), Mr. Shultz filed all of the foregoing documents with the Court along with a Certificate of Budget and Credit Counseling Course and some Employee Pay Advices (together, the "Initial Filing Documents"), thus commencing Ms. Suazo's bankruptcy case.  As Mr. Shultz testified, "[c]ontemporaneously with filing the Petition," he used Ovation's credit card to pay Ms. Suazo's $338.00 Chapter 7 filing fee using Ovation's funds.  Mr. Shultz spent about two to three

---

[61]     Ex. 6 at 7; Stip. Fact No. 94.
[62]     By the time the Debtor filed her case on December 9, 2020, the filing fee had increased to $338.00, which increase was effective December 1, 2020.
[63]     Ex. 1; Stip. Fact Nos. 16-17.

hours communicating with Ms. Suazo and preparing the Initial Filing Documents before submitting them to the Court.

One of the Initial Filing Documents — the Initial Compensation Disclosure — explained the compensation arrangement between Ms. Suazo and her counsel. The following is the text of the relevant portions of the Initial Compensation Disclosure:

1. Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

For legal services, debtor(s) have agreed to pay. . . . . . . . . . . . . . . . . . . . . . . . . . . . $  2,998.00

Prior to the filing of this statement I have received . . . . . . . . . . . . . . . . . . . . . $      0.00

Balance Due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $  2,998.00

5. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

   a.  Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

   b.  Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;

   c.  Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;

   d.  OTHER:

8. Counsel offered debtor(s) two options for the payment of counsel's fees: (1) pre-pay the fees in full prior to the Chapter 7 bankruptcy petition being filed, or (2) bifurcate the attorney services into pre- and post-petition work in order to facilitate the debtor(s) obtaining the benefit of being filed right away and making payments post-petition for the post-petition work. Counsel charges a higher fee for the second option. There are a number of reasons for charging a higher fee:

   a.  Counsel performs additional work to split the engagement;

   b.  Counsel takes on risk by allowing the debtor to pay the attorney fee over time instead of collecting the entire fee up front;

   c.  The option provides the debtor(s) with the benefit of a quicker filing than if the debtor(s) had to come up with the money to pay in advance;

   d.  The option gives debtor(s) an opportunity to begin rebuilding their credit score by making timely payments toward the attorney fee;

   e.  Counsel will not charge the debtor additional fees for certain services that if required would otherwise cost the debtor(s) more if debtor(s) had paid the entire fee before the case was filed; and

   f.  FSF (described below) charges a fee to Counsel for its financing, payment management, credit reporting and other services provided to Counsel, for which FSF charges a fee equal to 25% of the attorney fee that the Law Firm charges debtor(s) for the post-petition services.

This higher fee nonetheless satisfies the reasonability requirement under Section 329 applying the Lodestar analysis. The additional cost was fully disclosed to debtor(s) and debtor(s) chose the second option.

> 9. Debtor and counsel entered into two, separate fee agreements for pre- and post-petition work.
>
> a. The first, pre-petition fee agreement was signed prior to the filing of the petition for the preparation and filing of the bankruptcy petition, statement about social security number, creditor list and other documents required at the time of filing; and review, analysis and advisement of the typical matters that are required to be performed prior to filing by a bankruptcy attorney under the applicable bankruptcy and ethical rules. Counsel's fees paid under the first fee agreement (if any) are shown in Section 1 above as "Prior to the filing of this statement I have received", and any fees earned but not paid for the pre-petition work were waived by counsel.
>
> b. The second, post-petition fee agreement was signed after the petition was filed for post-petition work to be performed, including the preparation of schedules of assets and liabilities, and statement of financial affairs; preparation and filing of other required documents; representation at the first meeting of creditors; and other services outlined in the fee agreement. Counsel's fees owed by debtor under the second fee agreement for post-petition work are reflected in Section 1 above as the Balance Due. The second fee agreement allows the debtor(s) to pay these post-petition fees and costs in installments over 12 months following the bankruptcy filing.

Both Ms. Suazo and Mr. Shultz signed the Initial Compensation Disclosure and certified its accuracy. Mr. Shultz signed on behalf of "The Law Offices of Jonathan P. Shultz, LLC." Ovation was not mentioned at all in the Initial Compensation Disclosure.

Several parts of the Initial Compensation Disclosure are false. For example, the Initial Compensation Disclosure states that "Debtor and counsel *entered into* two, separate fee agreements for pre- and post- petition work." (Emphasis added.) However, as of the Petition Date, Ms. Suazo had only entered into the Pre-Filing Agreement with Ovation. The Initial Compensation Disclosure also recited that: "[t]he second, post-petition fee agreement *was signed* after the petition was filed for post-petition work . . . ." (Emphasis added.) That passage was wrong for the same reason. The Initial Compensation Disclosure erroneously identified Ms. Suazo's counsel as: "The Law Offices of Jonathan P. Shultz, LLC." But, the Pre-Filing Agreement was with Ovation.

## E.   Bankruptcy Services Performed by Ovation and Mr. Shultz After the Petition Date but Before the Post-Filing Agreement.

The initial bankruptcy filing was a "skeletal" submission missing many documents required by Section 521 and Fed. R. Bankr. P. 1007(b). Accordingly, after the Petition Date, Mr. Shultz worked to prepare the remaining required materials. Between December 9, 2020, and December 13, 2020, Mr. Shultz drafted Ms. Suazo's Statement of Financial Affairs, Summary of Assets and Liabilities, Schedules (including Schedules A/B, C, D, G, H, I and J), and Chapter 7 Statement of Current Monthly Income (together, the "Supplemental Filing Documents"). Ms. Suazo executed the Supplemental Filing Documents on December 13, 2020. A few days later, on December 15, 2020, Mr. Shultz filed all the Supplemental Filing

14

Documents with the Court.[64]  At that stage, Mr. Shultz and Ovation had completed the lion's share of the work in Ms. Suazo's Chapter 7 bankruptcy case.

Ms. Suazo's Statement of Financial Affairs illustrates that Ms. Suazo earned only very modest income over the last several years.  In 2018, she earned wages, commissions, bonuses, and tips of $22,874.00.  The next year, 2019, she made slightly more:  $24,825.00.  But in 2020, Ms. Suazo suffered a precipitous decline to only $8,691.00 in income, thereby placing her below both the federal poverty level and the Colorado median income level.[65]

Ms. Suazo's Schedules show that she had very few assets and very few dischargeable debts.  When she filed for bankruptcy, Ms. Suazo listed only the following assets:

| | |
|---|---|
| 2013 Ford Vehicle: | $6,650.00 |
| Furniture: | $  500.00 |
| Electronics: | $  500.00 |
| Clothing: | $  200.00 |
| Jewelry: | $  100.00 |
| Money: | $    85.00 |
| Total: | $8,035.00[66] |

Ms. Suazo asserted that all of the foregoing assets (except the vehicle) were exempt from execution under Colorado law.  Shortly after filing her bankruptcy case, Ms. Suazo filed an "Amended Statement of Intention for Individuals Filing Under Chapter 7" declaring her intention to surrender the 2013 Ford vehicle.  In any event, when she filed for bankruptcy protection, Ms. Suazo was effectively "judgment-proof."  And, according to Ms. Suazo's Statement of Financial Affairs, Ms. Suazo was not the subject of any collection activities by creditors (including lawsuits, administrative actions, foreclosures, repossessions, garnishments, attachments, seizures, or levies) as of the Petition Date.[67]  So, there was no particular emergency driving Ms. Suazo to file for bankruptcy immediately.

On the debt side of the ledger, Ms. Suazo identified only a single secured creditor on her Schedule D:  her vehicle lender, United Auto Credit Co. (the "Vehicle Lender").[68]  Ms. Suazo listed the secured claim at $7,762.00 and the value of the collateral as $6,650.00, thus leaving an unsecured deficiency of $1,112.00 for the Vehicle Lender.  On her Schedule E/F, Ms. Suazo listed aggregate unsecured claims of $42,362.00, including student loan debt of $37,987.00.[69]  So, her student

---

[64]    Ex. 3.
[65]    Ex. 3; Stip. Fact No. 34.  The Debtor reported 2020 income for a period slightly less than the entire year:  January 1 to December 9, 2020.
[66]    Ex. 3 at 11-14; Stip. Fact No. 35.
[67]    Ex. 3 at 3.
[68]    Ex. 3 at 17.
[69]    Ex. 3 at 19-25.

loan debt accounted for about 90% of all Ms. Suazo's unsecured debt.  Mr. Schwartz advised Ms. Suazo that her student loan debt was nondischargeable in bankruptcy.  So, (assuming later surrender of her vehicle) only $5,487.00 of Ms. Suazo's debts were potentially dischargeable through bankruptcy based upon the Supplemental Filing Documents.[70]

In addition to assets and liabilities, Ms. Suazo's Schedules also detailed her income and expenses as of the Petition Date.  According to Schedule I, Ms. Suazo earned monthly gross income of just $2,920.81.[71]  After subtracting various payroll deductions for taxes and insurance, Ms. Suazo had "take-home pay" or "combined monthly income" of $2,241.49.[72]  Schedule J shows that Ms. Suazo's "monthly expenses" totaled $2,350.00.[73]  So, when she filed for bankruptcy, she was in the red on a monthly basis.[74]  Assuming surrender of her vehicle after bankruptcy (and therefore the reduction of her vehicle expenses), Ms. Suazo's Schedule J shows that she had just barely enough to get by.  Her ability to pay Ovation $2,998.00 was extremely doubtful.

## F.    The Post-Filing Agreement.

After all the Supplemental Filing Documents already had been prepared by Mr. Shultz, signed by Ms. Suazo, and filed with the Court, Ovation sent Ms. Suazo a "Post-Filing Agreement" (the "Post-Filing Agreement") on December 16, 2020.[75]  Ms. Suazo signed the Post-Filing Agreement later that same day.[76]  Mr. Shultz signed the Post-Filing Agreement a day later on December 17, 2020.[77]

The preamble of the Post-Filing Agreement stated:  "By signing this agreement, you are hiring Ovation . . . to continue to represent you in your chapter 7 bankruptcy.  This agreement describes the legal services we will provide to you, the financial terms, and other terms of our relationship."  In the Post-Filing Agreement, Ovation listed 21 categories of legal services it "agree[d] to provide" *after* the Post-Filing Agreement.[78]  The list mirrors the "Post-Filing Services" identified in the Pre-Filing Agreement.  Most of such post-filing services were never provided to Ms. Suazo because they were not necessary in Ms. Suazo's case.  With respect to the seven categories of legal services actually provided to Ms. Suazo, most of the work (including the preparation and filing of the Supplemental Filing Documents) was actually performed *before* the Post-Filing Agreement (not after it).

---

[70]     The $5,487.00 amount of potentially dischargeable debt is calculated as follows: ($42,361.00 (total debts) minus $37,987.00 (nondischargeable student loans) minus $1,112.00 (unsecured deficiency on vehicle) = $5,487.00.

[71]     Ex. 3 at 29-30.

[72]     *Id.*

[73]     Ex. 3 at 31-32.

[74]     *Id.*; Stip. Fact No. 38.

[75]     Ex. 7 at 10.

[76]     Ex. 7 at 10; Stip. Fact No. 60.

[77]     *Id.*

[78]     The terms in the Post-Filing Agreement are all future-oriented.  For example, the text identified the legal services "we *will provide* to you . . . ."

In any event, per the Post-Filing Agreement, Ms. Suazo committed to pay $2,998.00 in 12 equal monthly payments of $249.83.[79]  The balance of the Post-Filing Agreement repeats virtually verbatim the same text contained in Section 3 (Information about the Lender the Law Firm Uses So It Can Offer the File Now Pay Later Option), Section 4 (Important Information About Conflicts of Interest), Section 5 (Your Obligations to the Law Firm, the Bankruptcy Court, and the Trustee), and Section 6 (Additional Important Terms) of the Pre-Filing Agreement.  Based upon the Post-Filing Agreement and her financial circumstances, the Court finds that Ovation and Mr. Shultz agreed to assist Ms. Suazo in an effort to discharge about $5,487.00 in debt while also having Ms. Suazo incur $2,998.00 in new, nondischargeable debt for attorney fees which Ms. Suazo had no ability to pay.  So, the net benefit to Ms. Suazo of the Post-Filing Agreement was quite nominal.

## G.   Bankruptcy Services Performed by Ovation and Mr. Shultz After the Post-Filing Agreement.

After the Post-Filing Agreement was executed, Ovation and Mr. Shultz performed very limited additional bankruptcy services for Ms. Suazo.  Mr. Shultz represented Ms. Suazo in a Section 341 meeting with the Trustee.[80]  Afterward, because Ms. Suazo had indicated that she wished to surrender her vehicle, Mr. Shultz filed an "Amended Statement of Intention for Individuals Under Chapter 7" confirming Ms. Suazo's intention to surrender her vehicle along with conforming "Amended Schedules D and E/F."[81]

Many months later, after Ms. Suazo already had obtained a bankruptcy discharge and after the UST filed the Motion to Examine, Ovation and Mr. Shultz also submitted an "Amended Disclosure of Compensation of Attorney for Debtor" (the "Amended Compensation Disclosure").[82]  Mr. Shultz signed the Amended Compensation Disclosure and referenced Ovation.  However, unlike the Initial Compensation Disclosure, Ms. Suazo did not execute the Amended Compensation Disclosure.  In any event, in the Amended Compensation Disclosure substantially changed the representations asserted in the Initial Compensation Disclosure.

## H.   Ms. Suazo's Payments to Ovation.

Ms. Suazo paid nothing to Ovation before the Petition Date.[83]  Subsequent to the Pre-Filing Agreement and Post-Filing Agreement, Ms. Suazo paid Ovation only four installments of $249.83 each, for a total of $999.32.[84]  Ms. Suazo defaulted on all the additional amounts allegedly owed to Ovation.

---

[79]   Ex. 7 at 2.
[80]   Ex. 9.
[81]   Ex. 4.  The only change on the Amended Schedules D and E/F was to move the claim of the Debtor's Vehicle Lender from Schedule D (secured) to Schedule E/F (unsecured).
[82]   Ex. 5.
[83]   Stip. Fact No. 58.
[84]   Ex. 8.

## I.   Other Bankruptcy Cases.

Mr. Shultz, through the Shultz Law Firm and also as an Ovation partner, used the "File Now Pay Later" fee model in the following additional bankruptcy cases (the "Other Cases"):[85]

| Debtor(s) and Case Number | "Pay Before You File" Fee[86] | "File Now Pay Later" Fee | Firm | Dates Pre- and Post-Petition Agreements Signed by Debtor(s) and Counsel | Petition Date |
|---|---|---|---|---|---|
| Le Andre McWilliams No. 20-17181 EEB | $1,399 + Debtor pays $335 filing fee | $2,000 | Shultz Law Firm | Oct. 28, 2020 / Nov. 2, 2020 | Nov. 2, 2020 |
| Raymond and Christine Rico No. 20-17290 JGR | $1,500 + Debtor pays $335 filing fee | $2,000 | Shultz Law Firm | Nov. 4, 2020 / Nov. 8, 2020 | Nov. 8, 2020 |
| Laura Alexander No. 20-17650 EEB | $2,343 (includes $335 filing fee, credit report fee, creditor counseling class, and debtor education class) | $2,998 | Ovation | Nov. 3 and 4, 2020 / Dec. 2 and 3, 2020 | Nov. 25, 2020 |
| Christina R. Strubhar No. 20-17979 JGR | $1,500 + Debtor pays $338 filing fee | $2,000 | Shultz Law Firm | Dec. 14, 2020 / Dec. 16, 2020 | Dec. 16, 2020 |
| Ray C. Casillas No. 21-10037 KHT | $1,960 (includes $338 filing fee, credit report fee, creditor counseling class, and debtor education class) | $2,340 | Ovation | Dec. 29, 2020 / Jan. 8, 2021 | Jan. 6, 2021 |
| Marina V. Kainov No. 21-10924 JGR | $1,960 (includes $338 filing fee, credit report fee, creditor counseling class, and debtor education class) | $2,400 | Ovation | Feb. 20 and 23, 2021 / Feb. 28 and March 1, 2021 | Feb. 26, 2021 |
| Keith Lowell Rabin-Hoover No. 21-11394 TMB | $1,500 + Debtor pays $338 filing fee | $2,000 | Shultz Law Firm | Mar. 18, 2021 / Mar. 24, 2021 | Mar. 23, 2021 |
| Katrina Senora Johnson No. 21-11415 MER | $1,960 (includes $338 filing fee, credit report fee, creditor counseling | $2,700 | Ovation | March 19, 2021 / March 25, 2021 | Mar. 24, 2021 |

---

[85]     Exs. 14-23; Stip. Fact Nos. 74-75; .
[86]     The filing fee for Chapter 7 cases increased from $335 to $338 on December 1, 2020.

| | class, and debtor education class) | | | | |
|---|---|---|---|---|---|
| Darlene Marie Carter No. 21-11468 JGR | $1,960 (includes $338 filing fee, credit report fee, creditor counseling class, and debtor education class) | $2,400 | Ovation | March 4, 2021 / March 26 and 28, 2021 | Mar. 26, 2021 |
| Elinita H. Morrison 21-11740 TBM | $1,960 (includes $338 filing fee, credit report fee, creditor counseling class, and debtor education class) | $2,400 | Ovation | April 5, 2021 / April 7 and 8, 2021 | Apr. 7, 2021 |

As set forth above, in each of the Other Cases, the fee quoted for a "File Now Pay Later" filing exceeded the fee quoted for a "Pay Before You File" filing.  Further, the fees for a "File Now Pay Later" filing were higher than the fees Mr. Shultz typically charged prior to the time that he started working with Ovation and using a bifurcated model.[87]

The text of the Pre- and Post-Filing Agreements signed by the debtors in the Other Cases appears to be virtually identical[88] to those signed by the Debtor in this bankruptcy case.  In each of the Other Cases, Mr. Shultz and Ovation also utilized the services of FSF.[89]  Further, in each of the Other Cases, Mr. Shultz filed only the voluntary petition, a disclosure of compensation, a creditor matrix, an Official Form 121, and a verification of the creditor matrix to start the bankruptcy process.[90]  He did not file statements of financial affairs, schedules, or Official Forms B22A with the initial filings.[91]

In each of the Other Cases, Mr. Shultz filed a "Disclosure of Compensation of Attorney for Debtor" on the same date as the bankruptcy petition.  All of such documents were virtually identical to the Initial Compensation Disclosure in this bankruptcy case (except with respect to the name of the debtor, the amount of the fee, and the signature blocks).  Just as with the Initial Disclosure of Compensation in this bankruptcy case, the filings in the Other Cases were erroneous because they recited that "Debtor and counsel *entered into* two, separate fee agreements for pre- and post- petition work" and "[t]he second, post-petition fee agreement *was signed* after the petition was filed for post-petition work . . . ."  (Emphasis added.)

---

[87]     Ex. 25.  The compilation of "Disclosures of Compensation of Attorney for Debtor(s)" contained at Exhibit 25 shows that in 2020, Mr. Shultz charged an average of about $1,482.83 for non-bifurcated Chapter 7 cases.
[88]     The documents are not entirely identical in that the debtors are different and the amounts charged to the debtors vary from case to case, as listed in the chart.  Further, Section 2 of the Shultz Law Firm's Pre-Filing Agreement is slightly different from Section 2 of the Ovation Pre-Filing Agreement in that the Shultz Law Firm requires that its clients pay bankruptcy filing fees to the Court whereas Ovation pays such amounts.
[89]     Stip. Fact No. 76.
[90]     Stip. Fact No. 77.
[91]     Stip. Fact No. 78.

However, the various debtors had only entered into the Pre-Filing Agreements as of their respective petition dates.  Some of the filings in the Other Cases also were wrong because they did not reference Ovation as the debtors' law firm.

## V.     Legal Analysis.

The Court's task in this dispute is to determine whether Mr. Shultz and Ovation violated the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and/or this Court's Local Rules through use of the Pre-Filing Agreement and Post-Filing Agreement.  In so doing, it is the Court's "obligation to interpret the Code clearly and predictably using well established principles of statutory construction."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012).  The Court employs a fair reading method that dictates the primacy of the "language of the statute itself."  *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  It is the Court's obligation to apply the Code as written – even if the Court believes some other approach might better "'accord with good policy.'"  *Burrage v. U.S.*, 571 U.S. 204, 218 (2014) (citations omitted).

## A.     Overview.

A debtor who successfully completes a Chapter 7 bankruptcy case receives a discharge of pre-petition debt, except for certain debts enumerated in Section 523 which Congress has specifically designated as nondischargeable.  *See* 11 U.S.C. §§ 523 and 727(b).  There is no exception to the discharge of debts incurred in conjunction with pre-petition agreements to pay attorney fees in Section 523.  As such, pre-petition obligations to pay attorney fees post-petition are dischargeable in a Chapter 7 case.  *Rittenhouse v. Eisen*, 404 F.3d 395, 396 (6th Cir. 2005); *In re Fickling*, 361 F.3d 172 (2d Cir. 2004).  *See also Bethea v. Robert J. Adams & Assocs.*, 352 F.3d 1125, 1126 (7th Cir. 2003) ("Attorneys' fees are not among the debts excepted from discharge by § 523").  Further, Chapter 7 attorney fees cannot be treated as administrative expenses.  *Lamie v. U.S. Tr.*, 540 U.S. 526, 538-39 (2004).  Thus, if a Chapter 7 debtor agrees pre-petition to pay attorney fees for legal services, the debt for the portion of the fees unpaid as of the bankruptcy filing generally cannot be collected if a discharge is granted.  It is a very real conundrum created by the Bankruptcy Code.  But, that is why legal counsel in Chapter 7 bankruptcy cases almost universally require full payment of legal fees and costs before a bankruptcy petition is filed.

Ovation and Mr. Schultz have developed a scheme to try to circumvent the foregoing dilemma through bifurcation of pre-petition services and fees from post-petition services and fees under two supposedly independent contracts:  the Pre-Petition Agreement and the Post-Petition Agreement.  The UST contends that the bifurcated services and fee model as employed by Ovation and Mr. Shultz in this insolvency proceeding and the Other Cases violates Sections 105(a), 329, 524(c), 526, and 528, as well as L.B.R. 9010-1(c).  Ovation and Mr. Shultz disagree and argue that the bifurcated services and fee model is allowed by the Bankruptcy Code and related Rules.  They suggest that bifurcation is a "legitimate practice" which is

becoming "increasingly common and accepted" across the country because it promotes "plenary representation of debtors through the bankruptcy process" by enabling debtors who could not otherwise afford counsel to obtain legal representation.

**B.**     **Ovation and Mr. Shultz Violated Section 526 Because the Pre-Filing Agreement and the Post-Filing Agreement Are Misleading and Violate both the Bankruptcy Code and L.B.R. 9010-1(c).**

    **1.**     **Statutory and Rules Framework.**

Section 526 governs "debt relief agencies."  A "debt relief agency" is "any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration . . . ."  11 U.S.C. § 101(12A), The Bankruptcy Code imposes various requirements and limitations on debt relief agencies.  Attorneys for bankruptcy debtors are included within the definition of "debt relief agencies" and therefore are subject to such requirements and limitations.  *Milavetz, Gallop, & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 236-239 (2010).  So, Ovation and Mr. Shultz were required to comply with Section 526 in their dealings with Ms. Suazo.  Neither Ovation nor Mr. Shultz contends otherwise.

Section 526 provides, in relevant part, the core duties required of all debt relief agencies:

    (a) A debt relief agency shall not —

        (1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title;
    . . . .

        (3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to —

            (A) the services that such agency will provide to such person; or

            (B) the benefits and risks that may result if such person becomes a debtor in a case under this title; or

        (4) advise an assisted person or prospective assisted person to incur more debt in contemplation of such person filing a case under this title or to pay an attorney or bankruptcy petition preparer a fee or

charge for services performed as part of preparing for or representing a debtor in a case under this title.

. . . .

(c) (1) Any contract for bankruptcy assistance between a debt relief agency and an assisted person that does not comply with the material requirements of this section, section 527, or section 528 shall be void and may not be enforced by any Federal or State court or by any other person, other than such assisted person.

(2) Any debt relief agency shall be liable to an assisted person in the amount of any fees or charges in connection with providing bankruptcy assistance to such person that such debt relief agency has received, for actual damages, and for reasonable attorneys' fees and costs if such agency is found, after notice and a hearing, to have —

(A) intentionally or negligently failed to comply with any provision of this section, section 527, or section 528 with respect to a case or proceeding under this title for such assisted person;

(B) provided bankruptcy assistance to an assisted person in a case or proceeding under this title that is dismissed or converted to a case under another chapter of this title because of such agency's intentional or negligent failure to file any required document including those specified in section 521; or

(C) intentionally or negligently disregarded the material requirements of this title or the Federal Rules of Bankruptcy Procedure applicable to such agency.

. . . .

(5) Notwithstanding any other provision of Federal law and in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may —

22

(A) enjoin the violation of such section; or

(B) impose an appropriate civil penalty against
such person.

Section 526(c)(1) cross-references Section 528.  Section 528 requires a debt relief agency to execute a written contract with a debtor within five days of first providing services, but before the filing of the bankruptcy petition.  11 U.S.C. § 528(a)(1).  In the contract, the debt relief agency must:

explain[ ] clearly and conspicuously —

(A) the services such agency will provide to such assisted person; and

(B) the fees or charges for such services, and the terms of payment[.]

11 U.S.C. § 528(a)(1).

Section 526(c)(2)(B) also cross-references Section 521 and obligates a debt relief agency "to file any required document including those specified in section 521."  Section 521(a) provides:

(a) The debtor shall —

(1) file —

(A) a list of creditors; and

(B) unless the court orders otherwise —

(i) a schedule of assets and liabilities;

(ii) a schedule of current income and current expenditures;

(iii) a statement of the debtor's financial affairs . . . .;

(iv) copies of all payment advices or other evidence of payment received within 60 days before the date of the filing of the petition, by the debtor from any employer of the debtor;

(v) a statement of the amount of monthly net income, itemized to show how the amount is calculated; and

(vi) a statement disclosing any reasonably
anticipated increase in income or expenditures
over the 12-month period following the date of the
filing of the petition . . . .

The interaction between these statutes is key.  As one court explained it:

Section 526(c)(2)(B) creates a duty (and liability for
breach of the duty) by a debt relief agency to file
information required by Bankruptcy Code § 521.  In
addition, § 526 prohibits a debt relief agency from failing
to provide any service that such agency informed an
assisted person [that] it would provide in connection with
a bankruptcy case.

Competent representation and timely filing of documents
is clearly an obligation that an attorney owes a bankruptcy
client.  Section 526 provides that when a debt relief
agency (attorney) fails to comply, the bankruptcy court
may require refund of fees and [award] damages.

*In re Fahey*, 2009 WL 2855728, at *6 (Bankr. S.D. Tex. Sept. 1, 2009).  Put another
way, the Bankruptcy Code requires that "[a]ttorneys representing individual debtors
in consumer cases filed under chapter 7 of the Code . . . help debtors file the
necessary petition, schedules, statements, and pleadings covering the normal,
ordinary, and fundamental aspects of their case."  *In re Green*, 2014 WL 3724986,
at *3 (Bankr. W.D. La. July 24, 2014)*; In re Jackson*, 2014 WL 3722019, at *3 (W.D.
La. July 24, 2014) (same).  If a bankruptcy court determines that a debt relief
agency intentionally violated Section 526, or engaged in a clear and consistent
pattern or practice of violating Section 526, the court may enjoin the violation of
such section or impose an appropriate civil penalty.  11 U.S.C. § 526(c)(5).

Consistent with the Bankruptcy Code, the Federal Rules of Bankruptcy
Procedure, and the Court's inherent power to regulate the conduct of counsel
appearing before the Court, the Court adopted Rule 9010-1 of the Local Rules for
the United States Bankruptcy Court for the District of Colorado which governs
attorney representation in Colorado bankruptcy cases.  *See* L.B.R. 1001-1.  L.B.R.
9010-1 provides, in relevant part:

(c) **Scope of Representation/Employment; Limited
Unbundling**.

(1) Attorney Representation of a Debtor.
Representation of a debtor by an attorney before this
Court constitutes an entry of appearance for all
purposes in the debtor's bankruptcy case, except as

24

provided in L.B.R. 9010-1(c)(2).  While the attorney remains attorney of record for the debtor in the bankruptcy case, the attorney has a duty to advise the debtor on all bankruptcy matters that arise during the course of the bankruptcy case and to represent the interests of the debtor in connection with the bankruptcy case that may affect the debtor, the debtor's property and, in the case of reorganization proceedings, property of the estate.  An attorney may not circumvent this Rule by limiting services in his or her client engagement letter or in the attorney's disclosures filed in accordance with Fed. R. Bankr. P. 2016.

(2) Limited Unbundling.

   (A) Adversary Proceedings.  A debtor's attorney may expressly exclude adversary proceedings from the scope of the engagement; however, if engaged as the attorney in an adversary proceeding, an attorney may not exclude services within that adversary proceeding.
   . . .

   (C) Nonpayment of Fees. If the debtor fails to pay debtor's attorney for services rendered or to be rendered, the attorney may move to withdraw his or her appearance for the debtor in accordance with L.B.R. 9010-4, except:

      (i)  An attorney for the debtor may not withdraw prior to completion of the Basic Services, as defined in L.B.R. 9010-1(c)(5), except upon a showing of good cause.

      (ii) While a motion to withdraw is pending, the attorney must continue to perform for the debtor all Necessary Services, as defined in L.B.R. 9010-1(c)(4). These services may not be limited to the Basic Services.
      . . . .

(4) Necessary Services. Necessary Services refers to all services that are necessary to represent the interests of the debtor in a particular case.

(5) Basic Services. Absent a Court order to the contrary, a debtor's attorney may not move to withdraw as attorney prior to completion of the following services (the "Basic Services"):

(A)  meeting with the debtor, advising the debtor, and analyzing the needs of the case;

(B)  preparing a complete filing package as required by Fed. R. Bankr. P. 1007 and any necessary amendments thereto;

(C)  attending the debtor's meeting of creditors pursuant to 11 U.S.C. § 341 and any continued meetings of the same;

(D)  advising and assisting the debtor with any trustee requests for turnover and any audit requests from the United States Trustee; [and]

(E)  advising the debtor regarding any reaffirmation agreements[.]

The cross-reference to Fed. R. Bankr. P. 1007 and the "complete filing package" in L.B.R. 9010-1(c)(5)(b) effectively incorporates the filing requirements of Section 521.

In sum, L.B.R. 9010-1(c) requires an attorney who files a Chapter 7 bankruptcy case to represent the debtor "for all purposes in the debtor's bankruptcy case,"[92] with limited exceptions for (a) adversary proceedings and (b) circumstances in which a debtor has failed to pay for the attorney's services. But, even in circumstances where a debtor has failed to pay for an attorney's services, a debtor's attorney is not relieved of the obligation to represent the debtor until such time that the attorney files a motion to withdraw from the case and the Court grants such motion. To ensure that attorneys perform the Basic Services identified in L.B.R. 9010-1(c)(5), L.B.R. 9010-1(c)(2)(C)(i) and L.B.R. 9010-1(c)(5) provide that a debtor's attorney may not file a motion to withdraw until *after* he or she has provided the Basic Services. This means that an attorney for an individual debtor in Chapter 7 generally will not be permitted to withdraw from a case until *after* the attorney has filed every document required Section 521(a) and (b) and under Fed. R. Bankr. P. 1007, in addition to providing the other Basic Services, except upon a showing of good cause and only with advance Court approval. Attorneys who practice in this District are on notice of this obligation, which is mandated by Sections 521, 526, and 528 of the Bankruptcy Code.

---

[92]      L.B.R. 9010-1(c)(2)(B) includes another limited exception not applicable here: attorneys are not required to "file a paper or advance a position contrary to the attorney's obligations under Fed. R. Bankr. P. 9011."

## 2.    <u>The Pre-Filing Agreement Is Misleading</u>.

The Pre-Filing Agreement is misleading in numerous ways which constitute prohibited misrepresentations contravening Section 526(a)(3).  At a very fundamental level, Ovation and Mr. Shultz have attempted to improperly bifurcate and limit their legal services in a fashion contrary to the Bankruptcy Code and L.B.R. 9010-1(c) without adequate disclosure.  The Pre-Filing Agreement purports to create an extremely narrow set of unbundled Pre-Filing Services.  As it pertains to filings with the Court, Ovation and Mr. Shultz committed only to "prepar[e] and fil[e] your Chapter 7 Voluntary Petition, Statement about Social Security Numbers, Pre-Filing Credit Counseling Certificate and List of Creditors to start your Chapter 7 case."[93]  Then, per the "File Now Pay Later" option, Ovation and Mr. Shultz reconfirm the very limited nature of the services provided per the Pre-Filing Agreement:  "Under this Pre-Filing Agreement, we will **only provide the Pre-Filing Services listed above.**"[94] (Emphasis in original.)  Ovation and Mr. Schultz advised that "**The Pre-Filing Services are not all of the tasks that must be completed to successfully complete your chapter 7 case.**"[95] (Emphasis in original.)

So, the structure of the Pre-Filing Agreement contemplates only an admittedly deficient "bare-bones" or "skeletal" submission containing the minimum necessary to start a bankruptcy case.  The Pre-Filing Agreement is misleading because it omits explanation of all the numerous additional filings which are required to be made pursuant to Section 521(a)(1)(B) and Fed. R. Bankr. P. 1007(b) and (c) within 14 days after the Petition Date, such as:  a schedule of assets and liabilities; a schedule of current income and current expenditures; a statement of the debtor's financial affairs; a statement of the amount of monthly net income itemized to show how the amount is calculated; and a statement disclosing any reasonably anticipated increase in income or expenditures over the 12-month period following the Petition Date.  And even more importantly, Ovation and Mr. Shultz concealed from Ms. Suazo that Ovation and Mr. Shultz had a legal obligation upon their engagement (which could not be disclaimed in the Pre-Filing Agreement) under Section 526 and L.B.R. 9010-1(c) to file all documents required by Section 521(a)(1)(B) and Fed. R. Bankr. P. 1007(b) and (c) and perform all the Basic Services before moving to withdraw.  *See also In re Baldwin*, 2021 WL 4592265, at *6 (Bankr. W.D. Ky. Oct. 5, 2021) ("once [an attorney] files a Chapter 7 petition for a debtor, he is duty bound to complete the debtor's schedules and statement of financial affairs, attend the Section 341 meeting, and negotiate and attend any hearings on reaffirmation agreements . . . ."); *In re Minardi*, 399 B.R. 841, 850 (Bankr. N.D. Okla. 2009) ("Attorneys representing individual debtors in consumer cases filed under Chapter 7 of the Bankruptcy Code have certain essential duties they must perform.  They must help debtors file the necessary petition, schedules, statement, and pleadings.  They must attend the scheduled meeting of creditors.  [Further,] attorneys representing consumer debtors

---

[93]    Ex. 6 at 1.
[94]    Ex. 6 at 3.
[95]    *Id*.

must advise and assist their clients in complying with their responsibilities assigned by Section 521 of the Bankruptcy Code.").

Ovation and Mr. Shultz compounded the misleading nature of the Pre-Filing Agreement when they listed the "three choices to complete your case" that Ms. Suazo supposedly would have "after your case is filed":  (1) "You can represent yourself in your bankruptcy case"; (2) "You can hire another attorney to represent you in your bankruptcy case"; or (3) "*Within ten (10) days after your case is filed*, you can enter into a **Post-Filing Agreement** with us."[96]  (Emphasis in original.) But, Ovation and Mr. Shultz omitted a critical fourth choice: Ms. Suazo was entitled to have Ovation and Mr. Shultz continue to represent her in all aspects of her Chapter 7 case *without* entering into a new Post-Filing Agreement.  After all, pursuant to Section 521(a)(1)(B), Section 526(c)(2)(B), and L.B.R. 9010-1(c), Ovation and Mr. Shultz were obligated upon executing the Pre-Filing Agreement to complete all Basic Services (including preparing and filing all the required Section 521(a)(1)(B) documents).  Even Mr. Shultz seems to have recognized that obligation because his Initial Compensation Disclosure (submitted before the Post-Petition Agreement) stated:  "I have agreed to render legal service for all aspects of the bankruptcy case."[97]

Instead of informing Ms. Suazo about the fourth option (*i.e.*, having Ovation and Mr. Shultz continue to represent Ms. Suazo without a Post-Filing Agreement), Ovation and Mr. Shultz further misled their client by threatening withdrawal:  "If you choose the *File Now Pay Later* option but choose not to sign a Post-Filing Agreement, the Law Firm may file a motion to withdraw from your case, which may create a conflict of interest if you do not want the Law Firm to withdraw."[98] However, the threat of withdrawal is effectively foreclosed by L.B.R. 9010-1(c)(5) which states: "Absent a Court order to the contrary, a debtor's attorney may not move to withdraw as attorney prior to completion of [ ] the "Basic Services."  In order to avoid misleading Ms. Suazo, at a minimum Ovation and Mr. Shultz should have informed her in the Pre-Filing Agreement of the requirements of L.B.R. 9010-1(c)(5) and the general prohibition of withdrawal before counsel completed the Basic Services.

The Pre-Filing Agreement also is misleading since the two-contract model asserted and implemented by Ovation and Mr. Shultz was wholly illusory.  The confusion starts with the text of the Pre-Filing Agreement.  After taking pains to try to separate the Pre-Filing Services and the Post-Filing Services, the Pre-Filing Agreement contains this nugget:  "If you [Ms. Suazo] choose the *File Now Pay Later* option, you further represent that you are not doing this with the intention of having the Law Firm simply file your case [*i.e.*, the "skeletal" filing] and then withdraw, but instead to facilitate you making payments over time for your attorney fee so that you can have an attorney represent you through the entire chapter 7 process."[99]  That

---

[96]   *Id.*
[97]   Ex. 2 at 1.
[98]   Ex. 6 at 6.
[99]   *Id.* at 7.

sounds an awful lot like a pre-petition commitment to enter into the Post-Petition Agreement. At a minimum, it is exceedingly confusing. So confusing, in fact, that Mr. Shultz repeatedly confirmed that he had already agreed to represent Ms. Suazo "for all aspects" of her Chapter 7 bankruptcy case for $2,998.00 even before she entered into the Post-Petition Agreement.

In the Initial Compensation Disclosure, which was filed on the Petition Date (*i.e.*, after the Pre-Filing Agreement but before the Post-Filing Agreement), Mr. Shultz represented that "[f]or legal services, [Ms. Suazo has] agreed to pay $2,998.00." He listed the "Balance Due" as $2,998.00.[100] And, then, Mr. Shultz declared: "I have agreed to render legal services for all aspects of the bankruptcy case."[101] Mr. Shultz specifically recited that he had already agreed to: "[p]reparation and filing of any . . . schedules, statements of affairs and plan which may be required" and "[r]epresentation of the debtor at the meeting of creditors . . . ."[102] (which services Mr. Shultz had seemingly tried to disclaim in the Pre-Filing Agreement). To ensure that Ms. Suazo understood the foregoing arrangement, Mr. Shultz had Ms. Suazo sign and "certify that the foregoing is a complete statement of any agreement" for compensation. Thus, the Initial Compensation Disclosure, executed just a few days after the Pre-Filing Agreement but before the Post-Petition Agreement, illustrates the misleading nature of the Pre-Filing Agreement and the illusory supposed split between the Pre-Filing Agreement and Post-Filing Agreement. After the Motion to Examine was filed, Mr. Shultz filed an Amended Compensation Disclosure apparently seeking to "correct" the Initial Compensation Disclosure in this bankruptcy case. During the trial, he tried to characterize the Initial Compensation Disclosure as a "mistake." Maybe. But, he made the exact same "mistake" in every one of the Other Cases too.[103] Ovation and Mr. Shultz routinely certify to the Court that they and their clients have agreed for Ovation and Mr. Shultz to "render legal services for all aspects of the bankruptcy case" before any Post-Petition Agreement is executed. This practice illustrates the misleading character of the Pre-Filing Agreement, which purports to say the opposite.

Section 528(a)(1) (which is incorporated by Section 526(c)(1)) requires that attorney retention agreements must "explain clearly and conspicuously . . . the service such agency will provide to such assisted person . . . [and] the fees or

---

[100] Ex. 2 at 1.

[101] *Id*.

[102] *Id*.

[103] *See*, *e.g.*, *In re McWilliams,* Case No. 20-17181 EEB (Bankr. D. Colo.) Docket No. 5 and Ex. 14 (compensation disclosure reciting agreement to "render legal service for all aspects of the bankruptcy case" filed before post-filing agreement fully executed); *In re Rico*, Case No. 20-17290 JGR (Bankr. D. Colo.) Docket No. 7 and Ex. 15 (same); *In re Alexander,* Case No. 20-17650 (Bankr. D. Colo.) Docket No. 9 and Ex. 16 (same); *In re Strubhar*, Case No. 20-17979 JGR (Bankr . D. Colo.) Docket No. 6 and Ex. 17 (same); *In re Casillas*, Bankr. Case No. 21-10037 KHT (Bankr. D. Colo.) Docket No. 6 and Ex. 18 (same); *In re Kainov*, Case No. 21-10924 JGR (Bankr. D. Colo.) Docket No. 8 and Ex. 19 (same); *In re Rabin-Hoover*, Case No. 21-11394 TBM (Bankr. D. Colo.) Docket No. 5 and Ex. 20 (same); *In re Johnson*, Case No. 21-11415 MER (Bankr. D. Colo.) Docket No. 6 and Ex. 21 (same); *In re Carter*, Case No. 21-11468 JGR (Bankr. D. Colo.) Docket No. 5 and Ex. 22) (same); *In re Morrison*, Case No. 21-11740 (Bankr. D. Colo.) (Docket No. 8 and Ex. 24 (same).

charges for such services . . . ."  The foregoing discussion demonstrates that the Pre-Filing Agreement is not clear at all.  Instead, it is a model of misleading confusion.  And, the confusion inherent in the Pre-Filing Agreement is further demonstrated by the actual conduct of Ovation and Mr. Shultz.  While they purported to impose severe limitations in their representation of Ms. Suazo in the Pre-Filing Agreement (*i.e.*, effectively agreeing to provide only a "bare-bones" or "skeletal" bankruptcy filing), they did not themselves follow that approach.  Instead, Mr. Shultz prepared and filed all the Supplemental Filing Documents in the period after the Petition Date but before the Post-Filing Agreement was even executed.  At that stage, almost all the work in Ms. Suazo's Chapter 7 bankruptcy case was over.  So, the Post-Petition Agreement had become unnecessary and almost superfluous by the time it was presented to Ms. Suazo.  In reality, Ovation and Mr. Schultz appeared to act (consistent with the Initial Compensation Disclosure) as if the Pre-Petition Agreement was (notwithstanding the text) an agreement with Ms. Suazo to represent her in all matters in the case provided that she pay $2,998.00 after the Petition Date.  Under the circumstances of this case, the Pre-Filing Agreement and Post-Filing Agreement structure violates Section 528(a)(1) (which is incorporated by Section 526(c)(1)).  *In re Milner*, 612 B.R. 415, 440-444 (Bankr. W.D. Okla. 2019) (determining that the "Pre-Petition and Post-Petition Contracts [incorporating FSF funding] are anything but models of clarity, and fall far short of the required clear and conspicuous explanation of services to be provided, fees to be charged, and terms of payment"); *Green*, 2014 WL 3724986, at *6 ("The pre-petition retainer agreement and post-petition retainer agreement used in this case are void pursuant to the provisions of § 526(c)(1) of the Bankruptcy Code because they do not comply with the 'material requirements' of § 528.").

### 3.    The Post-Filing Agreement Is Misleading.

The Post-Filing Agreement constitutes a misrepresentation for all the same reasons as the Pre-Filing Agreement.  The Post-Filing Agreement is built on the same faulty premise that Ovation and Mr. Shultz could bifurcate their services without explaining clearly that they had a legal obligation (which could not be disclaimed) under Section 526 and L.B.R. 9010-1(c) to file all documents required by Section 521(a)(1)(B) and Fed. R. Bankr. P. 1007(b) and (c) and perform all the Basic Services.  But there are more issues.

Another problem is with the bankruptcy filing fee.  Ovation apparently advanced and paid the $338.00 filing fee in order to file the Petition and initiate Ms. Suazo's bankruptcy case.  Many bankruptcy courts have determined that attorneys are not permitted to advance filing fees for bankruptcy debtors in the expectation of repayment since such conduct violates Section 526(a)(4).  *In re Brown*, 631 B.R. 77, 102-03 (Bankr. S.D. Fla. 2021) ("a law firm's payment of the filing fee with postpetition repayment by the debtor violates the Bankruptcy Code . . ."); *Baldwin*, 2021 WL 4592265, at *7 ("Advancement of the filing fee by an attorney, with the expectation of repayment post-petition, violates the Bankruptcy Code . . . .").

The exact timing concerning the payment of the $338.00 filing fee and any obligation for Ms. Suazo repay such filing fee is somewhat confused.  Mr. Shultz initially testified that he paid the filing fee using Ovation's credit card "contemporaneously with filing the Petition."  This seems consistent with Fed. R. Bankr. P. 1007(a) which states:  "Every petition shall be accompanied by the filing fee . . . ."  However, on cross-examination Mr. Shultz testified that he first uploaded the Petition into the CM/ECF filing system and then immediately paid the filing fee after a "dialogue box" popped up.  Thus, the filing fee may have been paid a few moments after the Petition was filed.

In terms of Ms. Suazo's obligation to repay the $338.00 filing fee, the text of the Pre-Petition Agreement suggests that she had no such obligation for repayment.  However, in the Initial Compensation Disclosure also filed on the Petition Date, Mr. Shultz and Ms. Suazo both agreed to the opposite: "[f]or legal services, [Ms. Suazo has] agreed to pay $2,998.00."  And, the $2,998.00 figure included the $338.00 filing fee.  This contradictory evidence further demonstrates the illusory nature of the two-contract model.

In any event, Mr. Shultz and Ovation now contend that the $338.00 filing fee was paid after the Petition and that such timing has legal significance.  It does not.  Although this all seems like a hair-splitting exercise, if the $338.00 filing fee was advanced by Ovation after the Petition and if Ms. Suazo had no obligation to repay the filing fee, then the Post-Petition Agreement was misleading because it failed to disclose to Ms. Suazo that Ovation had already paid the filing fee (on a donative basis) and she had absolutely no obligation to commit to paying the already-paid filing fee.  Instead, the Post-Petition Agreement stated only: "By entering into this agreement, you are agreeing to pay the Law Firm $2,650 for the services described above, plus the $335 filing fee . . . ."[104]

On the other hand, if Ms. Suazo had committed on a pre-petition basis to re-pay Ovation for the $338.00 filing fee advanced by Ovation, then there may be a reaffirmation problem.  The Initial Compensation Disclosure filed on the Petition Date, plainly evidences that such a pre-bankruptcy agreement already existed committing Ms. Suazo to pay Ovation $2,998.00 (which amount include the $338.00 filing fee advanced by Ovation).  But, any such pre-petition understanding would have been, at best,   a commitment for a dischargeable unsecured loan or advance.  In that case. the Post-Petition Agreement may run afoul of Section 524(c) pertaining to reaffirmation of pre-petition debts.

Section 524(c) provides:

> An agreement between a holder of a claim and the
> debtor, the consideration for which, in whole or in part, is
> based upon a debt that was dischargeable in a case
> under this title is enforceable only to any extent

---

[104]    Ex. 7 at 2.

enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if —

(1) such agreement was made before the granting of the discharge . . . .;

(2) the debtor received the disclosures described in subsection (k) at or before the time at which the debtor signed the agreement;

(3) such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that —

    (A) such agreement represents a fully informed and voluntary agreement by the debtor;

    (B) such agreement does not impose an undue hardship on the debtor . . .; and

    (C) the attorney fully advised the debtor of the legal effect and consequences of [the reaffirmation agreement and default] . . . .

Through the Post-Filing Agreement, Ovation and Mr. Shultz did not comply with Section 524(c).  Under the foregoing scenario, at a minimum, in order to not be misleading, Ovation and Mr. Shultz would have been required to advise Ms. Suazo of the requirements of Section 524(c) and complied with such requirements when it sought to have Ms. Suazo reaffirm the filing fee debt through the Post-Petition Agreement.

Another problem with the Post-Filing Agreement is the timing.  By the time Ovation and Mr. Shultz presented Ms. Suazo with the Post-Filing Agreement, they had already completed almost all of the work necessary in a Chapter 7 bankruptcy case.  The Post-Filing Agreement should have advised Ms. Suazo of that fact and confirmed that she had no obligation to pay for such work under the Pre-Filing Agreement.  By omitting such information, Ovation and Mr. Shultz further violated Section 526.

### 4.    The Pre-Petition Agreement and Post-Petition Agreement Are Void and All Payments By the Debtor Must be Refunded.

Having decided that the Pre-Petition Agreement and Post-Petition Agreement contain misrepresentations in violation of Sections 524, 526, and 528, the remedy is fixed by statute.  Section 526(c)(1) states that "[a]ny contract for bankruptcy

assistance between a debt relief agency and an assisted person that does not comply with the material requirements of this section, section 527, or section 528 shall be void and may not be enforced . . . ."  So, the Court concludes that the Pre-Petition Agreement and the Post-Petition Agreement are void.  *See Green*, 2014 WL 3724986, at *6 ("The pre-petition retainer agreement and post-petition retainer agreement used in this case are void pursuant to the provisions of § 526(c)(1) . . . .).  Additionally, per Section 526(c)(2), Ovation must refund the Chapter 7 Trustee or Ms. Suazo all payments made by Ms. Suazo (approximately $999.32).

Additionally, in the Motion to Examine, the UST requested that Ovation and Mr. Shultz be enjoined from entering in fee agreements which violate Section 526.  That type of remedy is specifically contemplated by Section 526(c)(5).  Since Ovation and Mr. Shultz engaged in a clear and consistent pattern of practice of violating Section 526 in this bankruptcy case and all the Other Cases, injunctive relief is warranted.  Accordingly, the Court enjoins Ovation and Mr. Shultz from making any of the misrepresentations or misleading statements identified in this Opinion in future Pre-Petition Agreements and Post-Petition Agreements.  Of course, the Court recognizes that clear, conspicuous, and comprehensive disclosures advising clients that attorneys who are engaged to represent debtors in Colorado bankruptcy cases are required to provide the Basic Services under Sections 521, 526, and 528 as well as L.B.R. 9010-1(c) irrespective of whether the client chooses to enter into a Post-Petition Agreement, may make it less likely that clients ultimately sign a Post-Petition Agreement.  So be it.

## C.   Policy Arguments Are Unavailing and Contrary Authority Is Distinguishable.

The Court recognizes that the payment of Chapter 7 debtor's counsel can be very challenging under the framework established by the Bankruptcy Code.  And, there may be sound policy reasons supporting a bifurcated payment structure.  Indeed, in their Objection and during oral argument, counsel for Ovation and Mr. Shultz resorted rather extensively to arguments about policy, explaining that: "[d]ebtors are languishing outside of bankruptcy longer than ever before and at great personal and societal costs" and that "[o]nce debtors make the difficult choice to file for bankruptcy, the assistance of counsel becomes critical to their success."  Ovation and Mr. Shultz suggest that bifurcated fee agreements are the right policy solution.  However, The Court cannot legislate and cannot just make up a new policy framework for Chapter 7 debtor's counsel fees.  *See Baker Botts L.L.P. v. Asarco LLC*, 576 U.S. 121, 134 (2015) (the Supreme Court "lack[s] the authority to rewrite the statute" even if it wishes for a different policy result).  Under our constitutional framework, changes to the Bankruptcy Code must be passed by Congress.  So, policy arguments have no real role.

However, in addition to policy pleas, Ovation and Mr. Shultz also have cited case law supporting their position.  One of the key decisions promoted by Ovation and Mr. Shultz is *In re Hazlett*, 2019 WL 1567751 (Bankr. D. Utah 2019).  The *Hazlett* court started its legal analysis with an extensive discussion of the policy

conundrum (which seems to drive much of the opinion).  *Id*. at *5-6 (expressing concern that "the present [bankruptcy] system makes it difficult for individuals in need of Chapter 7 relief to afford an attorney").  Then the *Hazlett* court explored whether bifurcated fee agreements were prohibited by the Bankruptcy Code or the Utah Rules of Professional Conduct.  Under the heading "Bifurcated Fee Agreements Versus Unbundling," the *Hazlett* court opined:

> The Court wishes to distinguish between the use of bifurcated fee agreements and a limited services agreement or unbundling.  With unbundling, the attorney is contractually limiting services to a discrete task, such as filing the bankruptcy petition.  With bifurcated fee agreements, the attorney is contracting to represent the debtor during the entire case, contingent on the debtor signing the post-petition agreement.  The primary concern with unbundling is that the attorney provides a limited service and then leaves the client to his or her own devices to complete the legal process. This is problematic, even though it is becoming more widely recognized that having at least some legal representation in a consumer Chapter 7 case is better than none.

*Id*. at *7-8.  Somehow, the *Hazlett* court concluded "the bifurcated agreement" "did not involve unbundling."  *Id.* at 8.

Frankly, this Court does not understand the distinction suggested in *Hazlett*. Perhaps there is a difference in the contracts presented in this bankruptcy case and the contracts at issue in *Hazlett*.  But, in the Pre-Petition Agreement in this bankruptcy case, Ovation and Mr. Shultz were "contractually limiting services to a discrete task, such as filing the bankruptcy petition [*i.e.,* a "bare-bones" filing]."  They made it abundantly clear in the Pre-Petition Agreement which states:  "Under this Pre-Filing Agreement, we will **only provide the Pre-Filing Services listed above."**  (Emphasis in original.)  And, the Pre-Petition Agreement in this bankruptcy case is not a "contract[ ] to represent the debtor during the entire case . . . ."  Quite to the contrary, in the Pre-Petition Agreement, Ovation and Schultz threatened to withdraw unless Ms. Suazo agreed to enter into a new Post-Petition Agreement.  So, the Pre-Petition Agreement is a classic, archetypical example of problematic "unbundling."

In any event, after the foregoing, the *Hazlett* court explored whether the bifurcated fee agreements in that case violated the Utah Rules of Professional Conduct. That issue is not presented in this case.  Next, analyzing only Section 329 (not Section 526) in a few short passages, the Court reached its conclusion:

> Therefore, based on its review of the Utah Ethics Opinion, the Bankruptcy Code, and the applicable law, the Court finds that the use of bifurcated fee agreements in consumer Chapter 7 cases to effectuate affordable legal services are

34

> not *per se* prohibited by the Bankruptcy Code and applicable
> law, they do not *per se* implicate ethical issues, and they are
> not *per se* unfair.

*Id*., at *9.  Then, the *Hazlett* court established its own bespoke framework for when
future bifurcated fee agreements might be approved in Utah:

> . . . debtor's counsel may employ this option [bifurcated fee
> agreements] in situations where:  (1) it is in the best interests
> of the client (*e.g.*, the client could not otherwise afford to hire
> bankruptcy counsel); (2) the attorney provides appropriate
> disclosures, options, and explanations; (3) the client gives
> informed consent in writing; and (4) the attorney's fee and
> costs are reasonable and necessary.

*Id*. at 10.

In the end, the *Hazlett* decision has very little import to Court's consideration of
the issues presented in this case.  The Court is not called upon to decide whether
bifurcated fee agreements are *per se* prohibited in every case and makes no such
determination.  And, the Court will not endorse a new framework for what types of
bifurcated fee agreements might be good policy.  That would seem best left to the
Legislative Branch.  Instead, the Court must only decide the controversy presented:
whether the specific Pre-Petition Agreement and Post-Petition Agreement violate the
Bankruptcy Code and the Local Rules.  They do.

Ovation and Mr. Shultz also rely on the most recent decision regarding bifurcated
fee arrangements:  *In re Prophet*, 2022 WL 766390 (D.S.C. Mar. 14, 2022).  In *Prophet*,
the bankruptcy court decided that "bifurcated fee agreements are entirely impermissible
under SC LBR 9011-1(b)."  *Id.* at *6.  On appeal, the district court reversed and held that
bifurcated fee agreements are not *per se* impermissible because of the local rule.
However, the appellate court made "no determination as to the reasonableness of [ ]
fees, the propriety of using FSF to collect fees from the debtors, the adequacy of [ ]
disclosures to the debtors, or whether the record shows that the debtors provided
informed consent for the structure of the fee agreements."  *Id*. at *9.  All those issues
were left for development on remand.  In this case, the Court has not decided that all
bifurcated fee agreements are *per se* barred.  Instead, the Court centers its decision on
the misrepresentations and misleading nature of the Pre-Filing Agreement and Post-
Filing Agreement, which also negates informed consent.  So, the *Prophet* decision has
little bearing.

**D.**     <u>**The Court Declines to Address Unnecessary Additional Issues**</u>.

Through the Motion to Examine, the UST raised numerous other arguments
against the propriety of the Pre-Petition Agreement and Post-Petition Agreement
based on Section 105(a), Section 329, and otherwise.  The UST also attacked the
reasonableness of the fees charged by Ovation.  The Court is quite troubled that

this bankruptcy proceeding was filed to discharge approximately $5,487.00 in unsecured debt while leaving Ms. Suazo indebted to the tune of $2,998.00, in nondischargeable debt, under the Post-Petition Agreement.  And, the amount sought by Ovation materially exceeds the normal up-front charge in this jurisdiction.  Under those circumstances, the reasonableness of the fees charged by Ovation appears in doubt.  However, given the Court's disposition of this dispute, and as a matter of judicial economy, it is not necessary for the Court to address all the other problematic issues identified in the Motion to Examine.

## V.   <u>Conclusion and Order</u>.

The Court sympathizes with financially stressed individuals who may find it challenging, or even impossible, to accumulate sufficient funds to pre-pay for bankruptcy assistance.  The Court also understands why attorneys would like to be able to have clients pay post-petition for standard pre-petition services required for a debtor's case to proceed to discharge.  Indeed, there may well be sound policy reasons for changing the Bankruptcy Code to allow attorneys to be paid post-petition for performing even pre-petition services.  But, that is not the Court's role.  Instead, the Court focuses on the specific dispute presented.  The Pre-Filing Agreement and the Post-Filing Agreement used in this bankruptcy case (and all the Other Cases) failed to include adequate disclosures regarding the obligations of Ovation and Mr. Shultz under the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Rules.  Because the Pre-Filing Agreement and Post-Filing Agreement contain misrepresentations and are misleading, they are void.  Accordingly, it is

ORDERED that the Motion to Examine is GRANTED.  The Pre-Filing Agreement and Post-Filing Agreement with Ms. Suazo are canceled as void.  As a result, it is

FURTHER ORDERED that:

(1)    All fees paid to Ovation and Mr. Shultz (whether through FSF or otherwise) pursuant to the Post-Filing Agreement are DISALLOWED.  The amount of such fees must be turned over to the Chapter 7 Trustee, Simon E. Rodriguez, who may subtract from the fees any amounts that Ms. Suazo owes to the estate to account for pre-petition tax refunds, and then must refund all remaining amounts, if any, to Ms. Suazo.

(2)    Mr. Shultz and Ovation are hereby enjoined from making any of the misrepresentations or misleading statements identified in this Opinion in future Pre-Petition Agreements and Post-Petition Agreements in the District of Colorado.

DATED this 17th day of June, 2022.

BY THE COURT:

Thomas B. McNamara
United States Bankruptcy Judge